# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00759-CV

---

**A. B., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-21-002232, THE HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A.B. (Father) appeals from the trial court's decree terminating his parental rights to L.H. (Daughter), who was almost two years old at the time of trial.[1]  *See* Tex. Fam. Code § 161.001(b).  Father challenges the legal and factual sufficiency of the evidence supporting the predicate statutory grounds for termination and the best interest finding.[2]  We affirm the trial court's termination decree.

---

[1]  For the child's privacy, we will refer to her by an alias and to her family members by their relationships to her or by aliases.  *See* Tex. R. App. P. 9.8.

[2]  Mother executed an affidavit for voluntary relinquishment of parental rights on the second day of the jury trial.  The trial court thereafter found termination was in the best interest of Daughter and terminated Mother's parental rights pursuant to Section 161.001(b)(1)(k) of the Texas Family Code.  *See* Tex. Fam. Code § 161.001(b)(1)(k) (authorizing termination when parent has executed "an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter").  Mother has not appealed that determination.

## BACKGROUND

Daughter was born in November 2020, and at first Mother solely cared for Daughter. After the Texas Department of Family and Protective Services (Department) received a referral in December 2020, a family-based safety services (FBSS) case was opened for the family, and Mother reached out to Father about assistance with Daughter (although Father continued to live separately). FBSS was offered to both parents over the subsequent months. However, Mother's mental health and drug use were ongoing concerns, culminating with Mother being admitted into the hospital at least once in March or April 2021 for a drug overdose. The Department noted that the "drug use seemed to continue and increase as time went on," and that the maternal grandmother contacted the Department that she was no longer willing to help Mother care for Daughter. After another intake concerning Mother's drug use, Mother leaving Daughter in another person's care, and Mother's refusal to discuss the matter with the Department, the Department filed its original petition seeking termination and requested removal of Daughter on April 20, 2021. At five months old, Daughter was removed and placed with Foster Mother, with whom she continued to reside through trial approximately eighteen months later.

The final jury trial commenced on October 18, 2022. At the hearing, the jury heard testimony, including, as relevant to the present appeal, from Mother; Jennifer Parker, a Department substance use program specialist; Jessica Bonaguro, the former Department conservatorship caseworker; Melissa Siebert, a licensed clinical psychologist assigned to Father;

2

Kayleena Benevides, the current Department conservatorship caseworker; Foster Mother; and Father.[3]

Mother testified that she wanted to give up her parental rights and allow Foster Mother to adopt Daughter and that she believed terminating her and Father's parental rights was in the best interest of Daughter. Mother doubted whether Father is "capable of taking care of a two-year-old by himself." She explained that Father was not around when Daughter was born but was living separately in an apartment, and she only contacted Father in mid-December 2020 after the Department contacted her. When questioned why Father was not helping care for Daughter, Mother stated that she "believed it was safer that way because we would get into arguments too much."

Mother testified that she and Father met in December 2018, but initially she stopped seeing him because he was using psychedelic drugs. The pair began seeing each other, and using drugs together, a year later. Mother explained that in April 2021 (around the time of Daughter's removal), Father was not living with Mother and the two only saw each other on "a few occasions." Father and Mother did drugs together at the time ("mostly psychedelics"), and Mother explained that Father "has never really been into anything more than mostly just marijuana and a few different psychedelic drugs."

Mother also described several other drug-related interactions with Father during the pending termination proceeding. She described having to call the Department caseworker to stop a visit by Father with Daughter because she believed Father was on drugs at the time after Father "sent me a picture of something, and I know he was using it." She also described

---

[3] We describe only those portions of the witnesses' testimony that are relevant to Father's appeal.

3

contacting the Department caseworker in January 2022 because Father was "running outside [her] home naked" after having "allegedly taken some [prescription drugs]," although Mother believed "it was actually ibuprofen or something." Mother also explained that Father had used ketamine "on and off through the whole relationship," and in May 2022, she contacted Bonaguro, the then-conservatorship caseworker, texting that she had observed Father using ketamine, kratom, nitrous, mushrooms, and LSD, and that she believed Father would never stop using drugs. She also sent pictures of drug paraphernalia that she identified as Father's, and she clarified that the pictures were taken during the time Father resided with Mother from March to May 2022. Mother testified that Father had not provided her any illegal substances—and she did not know whether Father was still struggling with illegal substance use—since the parents split in May 2022.

Mother also expressed concerns about Father's mental health. She said that Father had depression, had expressed suicidal thoughts to her, and "the anger too has worried me a little bit." Mother explained that she and Father struggled with "mutual" domestic violence towards one another. When asked whether Father had an anger issue, Mother responded that "I think most people do to some degree." She confirmed that Father had broken several doors, and she conceded that breaking a door was an example of an anger issue. She later clarified that Father had not hit her but would "get in my face sometimes and like threaten me, and he wouldn't leave sometimes when I asked him to," and that Father would sometimes hold her down and they would mutually push one another. She also mentioned an experience when she called law enforcement because she "didn't feel safe" when Father refused to leave after they fought.

4

On cross-examination, Mother confirmed her own issues with substance abuse.[4] She also conceded she had recanted a past statement in March 2021 that she believed Father had drugged her and certain statements from January 2022 that she "didn't want anything to do with [Father]." She said that Father is "doing a lot better than when I met him," has "really stepped up" since becoming a father, and that "[a]s far as I can tell" he is more stable at the time of trial. Mother believed Father was a good dad to Daughter and had a good bond with Daughter but expressed concerns that "he's maybe not responsible enough to take care of her by himself." She emphasized that Daughter cannot call the police, ask for help, or feed and change herself at two years old, and that she needs a sober parent to care for her. Mother also mentioned that she believed Foster Mother is "a very kind person," "very understanding," and "loves [Daughter] like her own."

Jennifer Parker, a Department substance use program specialist, then testified regarding drug test results. Father's drug tests from July 26, 2022 (i.e., approximately fifteen months after Daughter's removal and three months before the final trial) were positive for ketamine, which Parker described as a "dissociative anesthetic" that is a "common drug of abuse." A hair follicle test also indicated a positive result for mitragynine, a metabolite for kratom, and "would constitute in the testing world a positive for kratom."[5] The July 2022 test was also positive for cocaine and its primary metabolite, which Parker explained is a "stimulant-type drug" that is "a very common drug of abuse." Parker explained that hair-strand testing has

---

[4] Mother conceded that, during the eighteen-month termination proceeding, she had participated in four separate drug rehabilitation treatment programs and that she had overdosed at least twice.

[5] Parker explained that kratom is a substance with "opioid-like effects" that in higher doses is mind-altering and that has become "very popular in western countries." On cross-examination, Parker confirmed that kratom is not currently illegal in Texas.

5

"about a 90-day window, but that window doesn't begin for about 7 to 10 days." Additional drug test results were also admitted into evidence, showing Father regularly tested positive for marijuana from May 2021 through April 2022. The results from a May 8, 2021 drug test (the month after removal) were also positive for amphetamines (MDMA), cocaine, marijuana, and opiates (morphine). Parker explained that these drug tests are "[v]ery" accurate for detecting use, although the test results do not show how many times the subject had used the drug "because each person's metabolism differs" and there are "many factors," such as potency and dosage.

Jessica Bonaguro, the Department conservatorship caseworker initially assigned to the case, testified that Daughter was placed in a foster home in April 2021. She explained that the Department's main concern at the time was substance abuse; Mother had overdosed and gone to an inpatient drug treatment program, while Father had begun an intensive outpatient program. Bonaguro was assigned to the case from April 2021 through July 2022 and explained that "[s]ome of the ongoing concerns were continued substance use despite working services" and relationship "volatility" between the parents involving "fights, altercations, sometimes law enforcement callouts." Father completed the intensive outpatient program in August 2021, and the September 2021 permanency hearing orders required both parents to refrain from taking any mind-altering substances and engage in anger management therapy.

Bonaguro described several fights between the parents, including a phone call from the parents in the middle of a fight during which they were "screaming at each other" about "each parent's substance use," and Bonaguro contacted the police because she was "very concerned that they were fighting in a moving vehicle." Mother also called Bonaguro in January 2022, informed her that she and Father were in a fight, and told her that Father had "swallowed a

6

whole bottle of [prescription drugs]," was "running around naked in the street," had "crashed his car," and was "blocking [Mother's] car in[] her driveway and that she didn't feel safe, and he wouldn't let her leave." Bonaguro called the police in response to this report.

In May 2022, Mother texted Bonaguro several pictures showing drug paraphernalia, identified that paraphernalia as belonging to Father, and informed Bonaguro that she had observed Father using ketamine, kratom, nitrous, mushrooms, and LSD. Bonaguro explained that at the time she was unaware of said drug use because "we were hopeful that [the parents] were sober." After receiving those text messages, the Department tested the parents for ketamine use. Father "passionately denied" to Bonaguro that he had been using any drugs, and he said Mother "had set him up and had planted the drugs in his closet." Bonaguro stated that her belief was that the photos taken by Mother were from inside the home the parents were sharing at the time. This would have been the home where Daughter would have returned to them before the trial court granted an extension of the final hearing. She stated that by June or July 2022, the Department still had "extensive safety concerns" if Daughter was in Father's or Mother's care.

Bonaguro testified that Daughter had been placed with Foster Mother for the entire termination proceeding, that she observed no safety concerns with Foster Mother, and that Foster Mother "was an extremely nurturing, safe, fun placement." Bonaguro testified that Foster Mother took several steps to promote a relationship between Daughter and her parents, including providing updates to the parents, creating a shared photo album, and helping with video calls. Bonaguro stated that she believed Foster Mother would continue to facilitate Daughter knowing her biological family, and she had no concerns about Foster Mother's "ability to keep [Daughter] safe during those interactions."

7

On cross-examination, Bonaguro stated that Mother had contacted her multiple times about Father being high and denied that Mother had recanted those allegations. Bonaguro testified that Father's visits with Daughter went well and that Father interacted appropriately with Daughter. She stated that Father met Daughter's needs during those visits, such as changing her diaper, and that Daughter appeared to enjoy the visits and time with Father. Bonaguro testified that Father also participated in supervised visits in his home. Bonaguro clarified that the supervised in-home visits occurred in April and May 2022 and took place in the same home where she believed the photographs of drug paraphernalia she received from Mother were taken. Bonaguro testified that the Department changed its recommendation to unrelated adoption after the January 2022 incidents when the Department was made aware of continued drug use. Bonaguro also confirmed that Father denied the drug use allegations and was separated from Mother.

Further, Bonaguro testified that Father's statements about his drug use were "inconsistent throughout the whole case" with other evidence, such as drug test results. She also expressed concerns regarding Father's anger, explaining that Father had been banned from the facilities of two different drug testing providers due to his interactions with staff. Summarizing the timeline of the case, Bonaguro stated that during her involvement Mother had attended three different drug treatment programs and been hospitalized twice, and that Father had completed one intensive outpatient treatment program but thereafter continued to test positive for substances including cocaine, ketamine, and marijuana. Bonaguro testified that the parents had been given "[m]any, many opportunities" to demonstrate they could be safe parents for Daughter before the Department changed the permanency plan from reunification to termination.

Melissa Siebert, a licensed clinical psychologist, testified regarding the psychological reports for Mother and Father. The psychological assessment of Father was performed on or around June 9, 2021. Father was diagnosed with substance use disorders, was indicated as using cannabis regularly, and was noted as using hallucinogens, including LSD, ecstasy, and ketamine. Father was also diagnosed with "ADHD, predominately hyperactive impulsive presentation," and Siebert noted a history of depression with "some indication of potential manic symptoms." Father admitted to Siebert that he was using the drugs referenced as part of the substance use disorders. On cross-examination, Siebert confirmed that Father's banning from drug testing facilities comported with her preliminary diagnoses of antisocial and narcissistic personality features. Siebert testified that Father was forthcoming in his answer "to the best of his abilities" but cautioned that Father "lacks understanding and insight."

Kayleena Benevides, the current conservatorship caseworker assigned to Daughter's case, then testified. She expressed concern that Father could not provide a safe, stable, and protective home because of his inconsistent drug testing, his positive drug tests, and the "abuse that was present in the case." Benevides also noted that the court had ordered parents not to use mind-altering substances and that some mind-altering substances are legal. Benevides expressed concern that drug paraphernalia in the home could be easily accessed by Daughter, who is not old enough to help herself and could be endangered. She also noted that many of the drugs were illegal, and therefore presumptively were acquired "through drug dealers that could have criminal background history." The Department was also concerned that the parents would not make appropriate decisions for Daughter because of their drug use. Benevides testified that the parents participating in services did not demonstrate a change in behavior because they continued to test positive for certain drugs even after completing services. Benevides testified

9

that the Department sought for the parents' rights to be terminated and Daughter to be adopted by Foster Mother. Benevides testified that termination of Mother's and Father's parental rights and adoption by Foster Mother was in Daughter's best interest and that Foster Mother had a good bond with Daughter, takes care of all of her needs, and is willing to adopt her. On cross-examination, Benevides explained that adoption by Foster Mother would allow Foster Mother to determine the amount of contact between Daughter and Father and Mother and that Foster Mother has stated "she's willing to keep contact with the biological parents when appropriate." When asked about the abuse between the biological parents, Benevides referenced an incident in which Father was aggressive with Mother during an altercation and in which were called, and a separate incident when Father broke down a door.[6]

Foster Mother testified that she had been caring for Daughter for eighteen months as of the time of trial, and that Daughter was originally placed with her when she was five months old. Initially, Daughter had delays in reaching her expressive speech milestones and had gross motor delays. Foster Mother stated that Daughter has "flourished," explaining that Daughter had graduated from speech therapy in June 2022; that she is developmentally on target for everything, including gross motor skills; and that she is a happy toddler in the highest percentile for height, weight, and head circumference. Foster Mother facilitated video chats with the parents and sent updates to the parents using a shared digital photo album and text messages.

---

[6] Cassandra Chenevert, the FBSS worker, also provided testimony regarding the purposes of FBSS, the parents' involvement in services, and the escalation to removal. She indicated that Father expressed willingness to participate in FBSS activities, but the removal process was ultimately initiated because of the growing concerns regarding Mother's drug use and her refusal to speak with the Department. Chenevert relayed that the Department's concerns grew because the "drug use seemed to continue and increase as time went on" and the maternal grandmother contacted the Department to inform it that she was no longer willing to care for Daughter.

Foster Mother initially supported reunification, but she changed her mind around May 2022 after she was informed by Mother that Mother and Father "got into a big fight and they broke up" and that Father "kicked in her front door and assaulted her and also brought . . . drugs into the house." After that incident, Mother began sending "incoherent text messages" that Foster Mother found "worrisome," told Foster Mother she lost her job and was accused of stealing, and Foster Mother saw a "major downturn in [Mother's] mental health." Foster Mother stated that she hopes to adopt Daughter but would continue to facilitate a relationship between Daughter and her birth parents so long as neither birth parent was under the influence of drugs. Foster Mother confirmed she was willing to provide a home for Daughter until she reached the age of maturity and that her home is safe and free of drug use and domestic violence.

Father testified that Mother contacted him in December 2020 when the initial case was opened and asked him if he "could start helping more." He tried to make the relationship work until the May 2022 incident, and then he moved out and found his own one-bedroom apartment, where he still resided at the time of trial. Discussing the May 2022 incident, Father stated that his hand was pricked by a needle in the trash can the night before and that he confronted Mother the next day. Father countered that only after he raised the needle and his suspicions of Mother's drug use did she "try to flip the script and say that she found all this stuff of mine." Father also explained that he broke down a door during that altercation because he was trying to retrieve his things from the apartment after Mother locked him out and related that "it just happened so fast."[7]

---

[7] Father also explained that the first door breaking incident occurred when he went to Mother's apartment in March or April 2021. Mother was not responding to his knocking, but Father could hear Daughter crying. He "felt like it was necessary" to break down the door because Mother "might be in danger, at which point [Daughter] was in danger." Father found

Father stated that he works full time as a delivery driver for an Amazon delivery service provider. Father stated he participated in the "Optimist Club," a local youth group, and was part of an amateur sports team. He admitted that when the case began, he lived in a rented room above a bar, and then spent some time sleeping in the back of his car; he noted that the first apartment was not a suitable place for an infant. Father admitted he had a car crash in January 2022 but denied he was under the influence at the time. He also noted he has a family history of depression.

Father admitted to some substance abuse history, but he denied currently using any illegal substances. Father explained that he had not used ketamine or any hallucinogenic drug since the previous year and had not used marijuana since January 2022, but he could not provide any explanation why he tested positive for ketamine in July 2022. When questioned about the July 2022 drug test results, Father stated that he did "not believe them to be accurate as far as the cocaine goes." Father also disputed the "time window" of the ketamine, noting that he had done "ketamine in the past, but the six-month window that has been suggested is inaccurate." Father disputed Mother's texts saying he was using ketamine and other drugs in May 2022. Father stated that he has never used drugs around Daughter or shown her any type of anger. Father also disputed that he knew Mother used illegal substances when he left Daughter with Mother, and Father explained that March 2021 was the first time he saw her "nodded out" and "unconscious on heroin," which he differentiated from cannabis.

Father also disputed that he had anger issues, although he agreed that being banned from multiple drug testing facilities, holding down a romantic partner, and breaking

Mother unconscious inside; ultimately, Mother was taken for medical treatment, and Father left Daughter with Mother's "best friend" before he also left the scene.

12

down doors was not normal behavior. When questioned about being asked to leave the two drug testing facilities, Father explained that at one facility he "felt like a ton of hair was cut" for a hair follicle test and "reacted poorly." At the other, he said that he arrived five minutes before his deadline to take the drug test, but that the facility would not let him sign in without a mask. Although Father explained that another person later gave him a mask, he indicated that by then "the damage had been done." Father stated he learned from these experiences, and that he can now provide stability and be the father his Daughter needs.

Father described his supervised visits with Daughter, stating that they are "as wonderful as they can be in a little 10-by-10 box" and that he had not missed any supervised visits. Father stated that he did not want his parental rights terminated and wanted to be Daughter's conservator. He believed his being named conservator was in Daughter's best interest because "I would do anything for her, and I just always want to be there." Father explained that he wanted to retain his parental rights but that he was not asking for Daughter to come home with him because "I work six or seven days a week, sometimes 15 hours a day" and did not "know how I would logistically handle working a 15-hour day and having a child." Father stated that Mother's relinquishing her parental rights and wanting Foster Mother to adopt Daughter was Mother "looking out for [Daughter's] best interest and the best interest of [Mother's] newborn child." When questioned whether it was better for Daughter to be adopted by Foster Mother or remain in the foster care system, Father agreed it was better for Daughter to be adopted.

After the three-day trial, the jury found that predicate grounds (D), (E), and (P), as well as best interest, supported termination of Father's parental rights. *See* Tex. Fam. Code § 161.001(b)(1)(D) (concerning knowingly placing or knowingly allowing a child to remain in

13

an endangering environment), (E) (engaging in endangering conduct or knowingly placing child with persons engaging in endangering conduct), (P) (using controlled substance in manner endangering to child and either failing to complete, or continuing abuse of controlled substance after, court-ordered substance abuse treatment program). The Court thereafter appointed the Department as non-parent sole managing conservator of the child. The final decree of termination was signed on October 31, 2022, and this appeal followed.

## STANDARD OF REVIEW

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007. Father's briefing is inexact, but he appears to challenge both the legal and factual sufficiency of those findings.

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When determining legal sufficiency, we consider whether "a reasonable factfinder could form a firm belief or conviction that the finding was true" when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered. *Id*. at 631. When determining factual sufficiency, we consider whether "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction

14

that the finding was true." *Id*. We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id*. "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id*.

## DISCUSSION

In his first issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings under subsections (D), (E), and (P). In his second issue, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding.

*Statutory-Predicate Grounds*

In his first issue, Father challenges the sufficiency of the evidence supporting the trial court's findings under subsections (D), (E), and (P). We begin by analyzing the subsection (E) finding because it controls our determination. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or

15

knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *Id.* at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)). That is, our analysis under subsection (E) "focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child." *A.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00526-CV, 2022 WL 627224, at *6 (Tex. App.—Austin Mar. 4, 2022, no pet.) (mem. op.).

For purposes of a parent's conduct under subsection (E), "endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Boyd*, 727 S.W.2d at 533); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied).

When considering whether a parent's conduct was endangering under subsection (E), "the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied); *see also S.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00142-CV, 2021 WL 3437891, at *1 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *C.B.*, 458 S.W.3d at 582.

Father contends that there was insufficient evidence supporting the subsection (E) grounds because the State failed to connect the "scant evidence" of Father's drug use to any endangerment of Daughter's physical or emotional well-being. He complains that the Department failed to demonstrate Father himself endangered Daughter through his conduct and instead relied on his alleged actions and inactions relating to *Mother's* conduct. We disagree.

"Although we agree that 'a finding of endangerment based on drug use alone is not automatic,'" there is no requirement that direct evidence show a causal link between drug use and endangerment. *See D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 61 (Tex. App.—Austin 2021, no pet.) (quoting *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.— Dallas 2019, pet. denied)). "'Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct,' meaning the Department does not have to prove that the parent's misconduct was directed at the child or that the child suffered an actual injury." *T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 WL 4692471, at *6–7 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.) (quoting *A.C.*, 577 S.W.3d at 699). The parent's use of narcotics and its effect on their ability to parent may qualify as an endangering course of conduct. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "This is because illegal drug use exposes children to the possibility that their parents could be impaired or imprisoned, which would endanger the children's physical and emotional well-being." *T.M.*, 2021 WL 4692471, at *6; *see also D.H.*, 652 S.W.3d at 60. Especially when the record contains evidence of the parent's drug use during the pendency of the termination suit—when the parent knows they are at risk of losing their child—such evidence is sufficient to support an endangerment finding under subsection (E). *See T.M.*, 2021 WL 4692471, at *6 (listing examples). Thus, "a parent's drug use might be so pervasive or serious that the factfinder

17

could reasonably infer that the drug use is endangering, despite a lack of evidence showing that the drug use caused some other endangering activity or even that the drug use occurred while the children were in the parent's direct care." *See D.H.*, 652 S.W.3d at 61.

The record here demonstrates the pervasiveness and severity of Father's drug use. In a hair follicle test the month after Daughter was removed, Father tested positive for amphetamines, cocaine, marijuana, and opiates (morphine). Father then proceeded to test positive for marijuana on a variety of hair and urine drug tests from May 2021 through April 2022 (i.e., the first year of the pending termination proceeding). Those positive tests continued to occur even though Father had completed an intensive outpatient program. Father also conceded at trial that he had last used hallucinogens around Christmas 2021, marijuana in January 2022, and ketamine "I want to say last fall [in 2021]," which all occurred during the pendency of the termination proceeding. In May 2022, Mother texted the conservatorship caseworker images of drug paraphernalia; stated that she had seen Father use ketamine "multiple times in front of me" and that Father "drinks kratom and uses nitrous, mushrooms, and lsd too"; and requested that the Department test Father's hair for ketamine. Father then tested positive for cocaine, ketamine, and kratom on a July 26, 2022 drug test, approximately three months before final trial (and over fifteen months after Daughter had been removed and the termination case initiated).

Father's arguments that the extensive evidence of his continued drug use does not demonstrate endangering conduct are unavailing. "A 'parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct.'" *S.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00239-CV, 2022 WL 5125206, at *14 (Tex. App.—Austin Oct. 5, 2022, no pet.) (mem. op.) (quoting *In re J.O.A.*, 283 S.W.3d at 345).

18

Father downplays this evidence by citing examples of courts rejecting endangerment findings based on a couple documented incidents of drug use, *see, e.g.*, *In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied), but the record here reflects not a few isolated incidents of drug use but continued and repeated use throughout the pending proceeding. And although Father denied using cocaine when confronted with the positive test result, Bonaguro testified that Father' statements about his drug use throughout the case had been consistently "inconsistent." *See In re A.B.*, 437 S.W.3d at 503; *see also In re J.P.B.*, 180 S.W.3d at 573 (requiring deference to factfinder when assessing credibility and demeanor of witnesses). Although Father contends that his drug tests show he made some progress, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.F.-G.*, 612 S.W.3d 373, 386 (Tex. App.—Waco 2020), *aff'd*, 627 S.W.3d 304 (Tex. 2021) (quoting *In re J.O.A.*, 283 S.W.3d at 346).

Although Father argues that there is no evidence tying his drug use to endangering conduct towards his daughter, there is no requirement for direct evidence of such a causal connection. *See D.H.*, 652 S.W.3d at 61 (quoting *In re C.V.L.*, 591 S.W.3d at 751). Moreover, the record belies that argument. Bonaguro confirmed at trial that Father had begun home visits with Daughter in April or May 2022 at the home he shared with Mother at the time and that that was the same home where she believed that pictures of drug paraphernalia that she received from Mother were taken. Mother testified that she contacted the Department to stop at least one visit by Father with Daughter because she believed Father was on drugs at the time after Father "sent me a picture of something, and I know he was using it." Bonaguro also testified that the parents had been given "[m]any, many opportunities" to demonstrate they could

19

be safe parents for Daughter before the Department changed the permanency plan from reunification to termination. And Foster Mother testified that she initially supported reunification but changed her mind after the May 2022 dispute between Mother and Father when Mother informed her that the two had "got into a big fight and they broke up" and that Father had "kicked in her front door and assaulted her and also brought in drugs into the house." *See Sylvia v. Texas Dep't of Fam. & Protective Servs.*, No. 03-09-00427-CV, 2010 WL 1507827, at *3 (Tex. App.—Austin Apr. 15, 2010, no pet.) (mem. op.) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."). Viewing all the evidence in the record before us, the record demonstrates that Father had an on-going issue with drug use—starting years before the birth of his child and continuing for almost fifteen months after Daughter was removed—and that drug use jeopardized his child's emotional or physical well-being. *See D.H.*, 652 S.W.3d at 64.

Furthermore, the record was not limited only to evidence of Father's endangering drug use. Mother testified that she and Father were abusive towards one another, that Father had an anger issue, that he broke several doors, and that he had made her not "feel safe" when he refused to leave after a fight. Although Mother clarified that the abuse was mutual, she also conceded that it "did get physical at certain times," explaining that Father "never hit" her but would hold her down and push her. Bonaguro testified that in January 2022 (that is, during the pending termination proceeding), Mother called her and said Father had taken a prescription drug, was "running around naked in the street," had "crashed his car," and was making Mother not feel safe by not letting her leave. And as discussed above, Foster Mother corroborated Mother's testimony that Father "kicked in [Mother's] front door and assaulted her and also brought in drugs into the house." Bonaguro also testified (and Father conceded) that Father had

20

been banned from at least two different drug testing facilities because of his interactions with staff. *See, e.g., R.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-16-00528-CV, 2016 WL 6575235, at *2 (Tex. App.—Austin Nov. 3, 2016, no pet.) (mem. op.) ("Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment." (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.))); *see also In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.").

Contrary to Father's contentions, there is sufficient evidence in the record that Father himself engaged in a course of conduct that endangered Daughter. *See A.R.*, 2022 WL 627224, at *6. We conclude that the evidence is legally and factually sufficient to support the district court's finding that Father engaged in conduct or knowingly placed Daughter with persons who engaged in conduct that endangered Daughter's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). We overrule Father's first issue on appeal.[8]

---

[8] Because we conclude sufficient evidence supports termination under subsection (E), we do not address the other predicate statutory grounds, including subsection (D). *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (explaining that appellate court may affirm termination judgment by upholding one termination ground under section 161.001(b)(1)); *see also J.B.M.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin April 13, 2023, no pet. h.) (mem. op.) (explaining that collateral consequences under Section 161.001(b)(1)(M) "are identical" under either subsection (D) and (E)); *E.F.-B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00443-CV, 2022 WL 17478423, at *3 (Tex. App.—Austin Dec. 7, 2022, no pet.) (mem. op.) ("We therefore need not address the other predicate statutory grounds, including subsection (E), because there is sufficient evidence supporting the trial court's termination under subsection (D)."); *C.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00654-CV, 2020 WL 828673, at *2 (Tex. App.—Austin Feb. 20, 2020, no pet.) (mem. op.) (declining to review sufficiency of evidence under subsection (D) because appellant did not challenge subsection (E)

*Best Interest Finding*

We turn to Father's second issue, challenging the legal and factual sufficiency of the evidence supporting the best interest finding. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever." *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pet. denied) (quoting *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.)).

We consider nine non-exhaustive factors to determine whether termination is in a child's best interest: the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also A.C.*, 560 S.W.3d at 631; *S.B.*, 654 S.W.3d at 255. The party seeking termination has the burden of establishing that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive; although one factor is not necessarily dispositive, in some instances evidence of a single factor may suffice to support the best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *see also In re C.H.*,

finding that separately triggers collateral consequences under subsection (M)); Tex. R. App. P. 47.1.

22

89 S.W.3d at 27; *S.B.*, 654 S.W.3d at 255. Ultimately, the *Holley* test focuses on the child's best interest, not the parent's. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.). Evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

Based on the record before us, there was sufficient evidence that termination was in Daughter's best interest. Father testified that he had full-time employment as a delivery driver since the start of 2022, is involved in a local organization and a sports team, and resides in a one-bedroom apartment since separating from Mother in May 2022. But when questioned at trial about his plans for Daughter, Father expressly stated he did not want Daughter to come home with him because "I work six or seven days a week, sometimes 15 hours a day" and "I don't know how I would logistically handle working a 15-hour day and having a child." Further, Father conceded that it "would be better for [Daughter] to be with [Foster Mother] than in the foster care system" for up to 16 years. *See J.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00621-CV, 2023 WL 2334980, at *14 (Tex. App.—Austin Mar. 3, 2023, no pet. h.) (mem. op) (explaining factfinder may weigh "whether the stability offered by termination and adoption would better serve [the child's] best interest than would an impermanent foster-care arrangement").

Father also testified that his supervised visits with Daughter were "as wonderful as they can be," that he was able to care for and take care of her needs during those visits, that he had not missed any supervised visits, and that he "can provide more [stability] at this point than ever in my entire life." Bonaguro testified that Father's visits with Daughter went well, that Father interacted appropriately with Daughter, and that Father met Daughter's needs during those visits. *See Smith v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 673, 681 (Tex.

23

App.—Austin 2005, no pet.) (explaining that "evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past"). But the record is also clear that Mother was responsible for Daughter prior to removal, and that other than in supervised settings, Father has not cared for Daughter by himself. Moreover, besides Father's testimony regarding his current apartment, there is no evidence in the record whether he has or can provide the furniture, clothing, or other items that may be needed for caring for his Daughter.

As discussed above, Father also has an extensive history with drug use, including drug use during the pendency of the termination proceeding. *See J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 525 (Tex. App.—Austin 2019, no pet.) ("[A] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." (quoting *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.))). That evidence was coupled with testimony by Father and others that Father had inconsistent living arrangements during the course of the termination proceeding, including renting a room above a bar that Father admitted was not appropriate for a child, sleeping in his car for a period of time, and cohabitating with Mother in an apartment where Mother found drug paraphernalia. Bonaguro also testified that the supervised in-home visits with Father occurred in April and May 2022 and took place in the same home where she believed that pictures of drug paraphernalia that she received from Mother were taken. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (explaining that "a parent's inability to provide adequate care for the child, lack of parenting skills, poor judgment, and repeated instances of immoral conduct may also be considered when looking at best interest").

24

In contrast, Foster Mother had been caring for Daughter since she was five months old, totaling approximately eighteen months as of the time of trial. Mother believes Foster Mother is "a very kind person," "very understanding," and "loves [Daughter] like her own." Daughter was "flourish[ing]" with Foster Mother, having graduated from speech therapy, being developmentally on target, and falling within the highest percentile for height, weight, and head circumference. Foster Mother confirmed that she hopes to adopt Daughter, that she was willing to provide her a home, and that her home is safe and free of drugs or domestic violence. Bonaguro testified that she observed no safety concerns with Foster Mother and that Foster Mother "was an extremely nurturing, safe, fun placement." *See S.B.*, 654 S.W.3d at 255 (stating stability and permanence are "paramount considerations" for child's emotional and physical needs and any emotional or physical risks to child now and in future). Bonaguro confirmed the efforts Foster Mother took to facilitate a relationship between biological parents and Daughter, and Bonaguro had no concerns about Foster Mother's "ability to keep [Daughter] safe during those interactions" with her biological family. Even Father conceded that Mother's relinquishing of her parental rights and wanting Foster Mother to adopt Daughter was Mother "looking out for [Daughter's] best interest."

Reviewing the record under the appropriate standards of review and considering the relevant factors, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination was in the best interest of Daughter. We overrule Father's second issue.[9]

---

[9] Father also argues that the trial court abused its discretion by appointing the Department as permanent managing conservator because Father contends there was insufficient evidence to support a finding that his appointment would impair Daughter's physical health or emotional development, citing subsection 153.131(a) of the Texas Family Code. As we have

## CONCLUSION

Having concluded there was legally and factually sufficient evidence supporting the trial court's termination under subsection (E) and its best interest finding, we affirm the trial court's final decree terminating Father's parental rights to Daughter.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed

Filed: May 4, 2023

---

previously explained, that section is inapplicable here because it only creates "a statutory preference for placement with a parent while a parent still retains [his] parental rights." *T.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00351-CV, 2014 WL 6845198, at *5 (Tex. App.—Austin Nov. 25, 2014, no pet.) (mem. op.). Father, however, no longer enjoys any conservatorship presumption after his parental rights have been terminated. *See* Tex. Fam. Code § 101.024(a) (noting that for purposes of Family Code, "the term [parent] does not include a parent as to whom the parent-child relationship has been terminated"). Father has failed to demonstrate his entitlement to appointment as managing conservator under Section 153.131. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *21 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op.), *reh'g denied* (June 28, 2021) (concluding no abuse of discretion in appointing Department after termination of parent's parental rights).